# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------ x
                                            :
NEHEMIAH W.,[1]                             :          3:24CV1782(RMS)
          Plaintiff,                        :
                                            :
                                            :
v.                                          :
                                            :
FRANK BISIGNANO, COMMISSIONER               :
OF SOCIAL SECURITY,[2]                      :          AUGUST 29, 2025
          Defendant.                        :
                                            :
------------------------------------------------------ x
```

## RULING ON THE PLAINTIFF'S MOTION FOR REVERSAL AND REMAND AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of the plaintiff's applications for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act") and supplemental security income benefits ("SSI") under Title XVI of the Act.[3]  It is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] When the plaintiff filed this action *pro se* on November 7, 2024, he did not name the Commissioner of the Social Security Administration, Martin O'Malley, as the defendant. (*See* Doc. No. 1).  On November 29, 2024, O'Malley left the agency.  Frank Bisignano has since been appointed as the Commissioner of the Social Security Administration.  As such, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this matter.

[3] Eligibility for DIB is premised, in part, on a disabled claimant's "insured status" under the Act, *i.e.*, payment into Social Security through employment income for a set period prior to application. *See* 42 U.S.C. §§ 423(a)(1)(a), *id.* at 423(c)(1). "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability. *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013).  *See* 42 U.S.C. § 1382(a).  "As the regulations for DIB and SSI are virtually identical and do not differ materially for the purposes of this case, hereinafter reference will be made only to the DIB regulations in the interest of conciseness." *Peterson v. Kijakazi*, No. 3:22-CV-00026 (VLB), 2023 WL 334379, at *5 n.7 (D. Conn. Jan. 20, 2023). *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)

The plaintiff now moves for an order reversing and remanding the decision of the Commissioner of the Social Security Administration (the "Commissioner") for further administrative proceedings. (Doc. No. 24). The Commissioner, in turn, has moved for an order affirming his decision. (Doc No. 26). For the following reasons, the plaintiff's motion for an order reversing and remanding the ALJ's decision is **GRANTED**, and the Commissioner's motion for an order affirming that decision is **DENIED**.

I.    <u>**PROCEDURAL HISTORY**</u>

On May 20, 2021, the plaintiff applied for DIB and SSI, claiming that he had been disabled since August 8, 2019. (Doc. No. 17, Certified Transcript of Administrative Proceedings, dated 12/30/2024 ["Tr."] 28, 293). The plaintiff reported he could not work due to epilepsy, bulging discs in his back, multilevel degenerative disc disease, cloudy vision in his right eye, anxiety, and depression. (Tr. 355). The plaintiff's application was denied initially and upon reconsideration. (Tr. 167–75, 185–91). On March 28, 2023, Administrative Law Judge ("ALJ") Matthew Kuperstein held a hearing during which the plaintiff and a vocational expert testified.[4] (Tr. 50–101). In June 2023, the ALJ issued an unfavorable decision denying the plaintiff benefits. (Tr. 25–49). The Appeals Council denied the plaintiff's request for review in April 2024, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 8–14).

The plaintiff filed his complaint in this pending action on November 7, 2024. (Doc. No. 1). The following month, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was transferred to the undersigned. (Doc. No. 15). On February 21, 2025, the

---

(explaining, in a Social Security case, that for "simplicity's sake, we will refer only to the Title II provisions, but our analysis applies equally to Title XVI").

[4] The ALJ previously held a hearing on September 29, 2022, but inadvertently it was not recorded. (Tr. 53).

plaintiff filed his Motion to Reverse the Decision of the Commissioner with a memorandum of law.  (Doc. Nos. 24, 24-1).  The Commissioner filed his Motion to Affirm and memorandum of law on March 26, 2025.  (Doc. No. 26).  The plaintiff did not file a reply.

## II.    FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' statements of material facts.  (*See* Doc. No. 24-1 at 1–7; Doc. No. 26 at 4).  The Court cites only the portions of the record that are necessary to explain this decision.

### A.    The Plaintiff's Hearing Testimony

On March 28, 2023, the plaintiff appeared for a hearing before the ALJ.  (Tr. 58–101).  His counsel, Abe Berman, was present and confirmed that the record was complete.  (Tr. 50).

The ALJ asked the plaintiff to testify about his work history.  From 2007 through 2016, the plaintiff worked at Cornell Scott-Hill Health where he scanned charts, medical information, and providers' release of information forms in the medical records system.  (Tr. 81).  This job was a seated position that required the plaintiff to frequently lift or carry five pounds or less and occasionally lift 25 pounds.  (*Id.*).

In 2017, the plaintiff suffered a workplace injury.[5]  (Tr. 63).  He was sitting in a chair that broke, and he fell to the floor.  (*Id.*).  As a result, the plaintiff sustained a back injury that caused him the limitations underlying this appeal.  (*Id.*).

From April through August 2019, the plaintiff worked for Midstate Medical Center where he cleaned offices.  (Tr. 82.).  The role required the plaintiff to stand and bend for the entire workday, as he was expected to sanitize desks and fixtures and empty small trash cans.  (Tr. 82–

---

[5] Based on the hearing transcript and the record generally, it is unclear where the plaintiff worked in 2017.

83).  Because of the frequent bending, the plaintiff was forced to call out frequently with excessive pain.  (*Id.*).  When asked how much weight the plaintiff was required to lift or carry, he could not recall.  (*Id.*).

Thereafter, the plaintiff attempted to work again through a vocational rehabilitation program with the State of Connecticut's Bureau of Rehabilitation Services ("DORS").[6]  (Tr. 60).  The plaintiff was placed at Burlington Coat Factory where he was asked to put tags and stickers on products.  (Tr. 72).  The plaintiff testified that he was allowed to sit and stand, but he had to take breaks due to his lower back pain.  (Tr. 73).  He was sent home after approximately one hour because the severity of his injury made him incapable of performing the job duties.  (Tr. 60, 72).

With respect to the DORS program, the ALJ asked the plaintiff's counsel to obtain additional information about the vocational rehabilitation work assignment.  Specifically, the ALJ stated,

> I'd like to give you an opportunity over the next two weeks, to get me a detailed explanation of everything that happened with your client at this place on, you know, when he was there, the date of it and the observations of the person who worked with him there, what they assigned him, and everything else—all their observations from that incident.

(Tr. 73).  The ALJ acknowledged receiving only the vocational program's letter from May 25, 2021, which stated that the plaintiff's condition was "too severe to benefit from vocational rehabilitation," and "visit notes from the supervisor at the time."  (Tr. 74).  The ALJ added that he was willing to have a supplemental hearing so the supervisor could testify.  (*Id.*).

---

[6] The State of Connecticut Aging and Disability Services' Bureau of Rehabilitation Services "helps people with disabilities get ready for, find, and keep jobs."  *What services does the Bureau of Rehabilitation Services offer?*, Aging and Disability Servs., (July 23, 2025), https://portal.ct.gov/ads/knowledge-base/articles/about-ads/ads-service-bureaus/about-the-bureau-of-rehabilitation-services?language=en_US. (Tr. 838).  Because the litigants and the ALJ use the State's commonly known umbrella acronym, DORS (*i.e.*, the Department of Rehabilitation Services), the Court will do the same.

4

The ALJ and counsel elicited testimony about the plaintiff's physical limitations.  The plaintiff described his back pain as an eight out of ten on a good day, and a ten out of ten on a bad day.  (Tr. 68).  According to the plaintiff, he could lift and carry no more than ten pounds.  (Tr. 69).  The plaintiff testified that he was unable to sit in a work chair longer than twenty minutes, after which the back of his legs would tingle and he would feel a sharp pain in his lower back radiating to his groin.  (*Id.*).  The plaintiff would have to walk around for fifteen minutes before he could sit again.  (*Id.*).  Since his back injury in 2017, he was unable to wash his feet and tie his shoes, and he suffered from back spasms.  (Tr. 62, 75).  The plaintiff testified that he could only walk half a mile without a cane before he started to get "a sharp pain and a tingle."  (Tr. 65–66).  The plaintiff's back pain affected his ability to walk, causing him to use a cane daily inside his house.  (Tr. 63).  The plaintiff tried not to use his cane outside his house, but occasionally, he would need it.  (Tr. 62–63).  This caused him so much embarrassment, he largely stayed in his house to avoid people.  For instance, the plaintiff used a delivery system to grocery shop so that he would not have to go outside.  (Tr. 64–65).

With respect to his mental limitations, the plaintiff testified that he suffered from depression and anxiety, which were sometimes so severe he could not get out of bed.  (Tr. 63).  In addition, the plaintiff testified, "I don't want to be around anymore."  (Tr. 62).  He testified that he would sweat and feel uncomfortable when he was around people (Tr. 66), and he did not have a social life (Tr. 71).  He also testified that he suffered from crying spells, nightmares, nervousness, insomnia and racing thoughts about three days per week, and an inability to focus.  (Tr. 63, 70–71).

**B.    The Vocational Expert's Testimony**

The vocational expert, Mary Vasishth, first testified that the plaintiff's past jobs would be identified as document preparer and hospital cleaner.  (Tr. 84–85).

The ALJ presented several hypotheticals and asked the vocational expert to opine about the possibility of substantial gainful activity with the following assumptions: the individual had the same work history as the plaintiff, completed high school, and was between 42 and 46 years old.  (Tr. 86–87).

First, the ALJ asked the vocational expert to testify about available jobs if the hypothetical person had limitations of (1) lifting, carrying, or pushing twenty pounds occasionally and ten pounds frequently; (2) standing or walking with normal breaks for four hours in an eight-hour workday; (3) sitting with normal breaks for six hours in an eight-hour work day; (4) climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling occasionally; (5) never climbing ladders, ropes or scaffolds; (6) no concentrated exposure to extreme heat or humidity, hazards; and (7) routine and repetitive work, involving simple instructions for two-hour periods, with only occasional changes in the work routine setting.  (Tr. 87).  The vocational expert testified that a person with these limitations could perform the document preparer job. (*Id.*).

Second, the ALJ presented a hypothetical with an additional limitation of monocular vision only in the right eye, which would also cause a lack of depth perception.  (Tr. 88).  The vocational expert testified that a person with this additional limitation could also perform the document preparer job.  (Tr. 89).  When further asked if the outcome would change if the individual could not interact with the general public and could only occasionally interact with co-workers or supervisors, the vocational expert's answer remained the same.  (*Id.*).

6

Third, the ALJ added a limitation in which the individual could not sit for more than fifteen minutes at a time. (Tr. 90). According to the vocational expert, an individual in this circumstance would need to be provided a sit/stand workstation to perform the document preparer job. (Tr. 90–91). The vocational expert testified that a sit/stand workstation "poses no hardship to an employer" and is "easily available," adding that five to ten percent of employers routinely have workstations. (Tr. 91). The ALJ then asked, "So some of the employers have it. Some of them don't. Would there be other work available for this individual with this further limitation?" (*Id.*). The vocational expert testified that other jobs would include photocopying machine operator, office helper, and mail clerk. (Tr. 92–93).

The vocational expert also testified about an individual's ability to be off-task and absent. (Tr. 93). The vocational expert testified that an employer would tolerate ten percent off-task behavior during the workday, *i.e.* six minutes per hour. (Tr. 94). In addition, an employer would permit one unscheduled absence per month. (Tr. 95).

C.    **Medical Evidence**

The records contain medical evidence from several providers: Yale New Haven Health from November 14, 2018 through April 13, 2022 for back pain and seizures (Tr. 504–660, 840–62, 915–20, 938–1004); Community Health Center from July 21, 2020 through February 20, 2023 for primary care (Tr. 661–802, 816–37, 863–906, 1014–1195); and Professional Vision Center from January 24, 2019 through July 2, 2021 for eye care (Tr. 803–15, 1005–1011). Because the medical evidence relevant to this appeal concerns the plaintiff's back pain, the Court summarizes the medical evidence only as to this impairment.

In 2017, the plaintiff suffered a workplace injury that caused him the chronic back pain at issue in this case. (Tr. 504). He participated in physical therapy in 2017, but he had to stop due to "significant pain." (*Id.*).

On December 13, 2018, the plaintiff sought treatment from the Yale New Haven Spine Center ("Spine Center"). (*Id.*). The notes indicated a "chronic history of low back pain with radiation to the right hip and bilateral groin with numbness and tingling to the bilateral anterior thighs" stemming from his workplace injury. (*Id.*). The plaintiff described his pain as persistent and constant with a severity of ten out of ten, and the pain increased with "prolonged walking and sitting." (*Id.*). He denied "new gait disturbance or falls." (*Id.*). The provider assessed the plaintiff and noted he felt "increased tenderness to palpitation" over his spine and in the axial back muscles; felt increased pain in his back "with flexion and extension" and "straight leg raise" on his right leg; and tested positive for facet joint issues as well as hip and/or sacroiliac joint issues on his right side.[7] Otherwise, the plaintiff had non-antalgic gait and did not require an assistive device to ambulate; did not have an elevated shoulder or pelvis; was not swollen in his extremities; had normal alignment and muscle tones; had no other issues with his major joints; and had full strength, normal sensation, and normal reflexes in the parts of his back, hips, legs, and feet that were tested. (*Id.*). The provider ordered an MRI and referred the plaintiff to physical therapy. (Tr. 507).

The MRI was completed on January 8, 2019. (Tr. 621). The results indicated "[m]ultilevel degenerative spondylosis progressed since prior MRI dated 3/16/2017." (*Id.*). The note further explained: "Most significant disc disease is at L5/S1 with right paracentral/foraminal disc extrusion contacting the descending right S1 nerve. Most prominent neural foraminal stenosis is at L4/5 which is moderate bilaterally." (*Id.*).

---

[7] The medical records indicate "[p]ositive facet loading in the lumbar spine" and "[p]ositive fabers test on right." (Tr. 506).

The plaintiff re-started physical therapy on January 16, 2019. (Tr. 510). The following day, he visited the Spine Center for a follow-up appointment. (Tr. 520–23). The examination results were largely the same as his previous appointment, and the same treatment was recommended. (*Id.*). The record indicates the plaintiff completed physical therapy in December 2018 and January 2019 "with limited relief in symptoms." (Tr. 529). He was discharged in March 2019 due to lack of attendance.[8] (Tr. 524–71).

On September 22, 2020 (during the COVID-19 pandemic), the plaintiff had a telehealth appointment with the Spine Center again, explaining that he had been doing home exercises with limited relief. (Tr. 539). Upon reviewing the plaintiff's MRIs from March 2017 and January 2019, the provider determined he had "multilevel degenerative changes with moderate foraminal stenosis at L4-5 bilaterally" and ordered a new MRI to determine "worsening intraspinal pathology in greater detail." (Tr. 541). The MRI was completed the next day with the following result: "Multilevel lumbar spondylosis, as detailed above, without high-grade spinal canal narrowing. Up to moderate neural foraminal narrowing at L3-4, L4-5 and L5-S1. Overall, no significant change In comparison with the prior study from 2019." (Tr. 987).

Follow-up appointment notes from October 21, 2020 and April 21, 2021 show that the plaintiff's symptoms remained largely the same, that he took prescription medication for pain (with limited effectiveness), and that he was unable to attend physical therapy because he did not have transportation. (Tr. 543–46, 555–61). The record indicates that the plaintiff consistently

---

[8] At a subsequent appointment in April 2021, the provider summarized the plaintiff's past participation in physical therapy, noting that he "was scheduled for multiple appointments with physiatry but did not have transportation and therefore was unable to present to these appointments." (Tr. 556). The note does not specify this time period, but, based on a review of the medical record, the undersigned surmises it relates to the early 2019 time period.

complained about his back pain during other medical appointments in 2020 and 2021. (*See, e.g.,* Tr. 661–62, 664, 668, 754, 766, 873–75).

On February 22, 2022, the plaintiff visited the Spine Center, complaining about lack of improvement. The provider noted that the plaintiff completed physical therapy "focused on lumbar stretching and strengthening in June and July 2021 without significant relief," and ordered an MRI "to assess for intraspinal pathology in greater detail."[9] (Tr. 942–43 (citation modified)). The result of his MRI on April 4, 2022, was as follows: "Multilevel lumbar spondylosis, unchanged compared to prior greatest at L4-5 with mild spinal canal stenosis and disc extrusion." (Tr. 975). While the record does not include additional appointments with the Spine Center, the plaintiff complained about back pain at subsequent therapy appointments that year, including in August and November 2022. (Tr. 1035, 1158).

### D.    <u>Department of Rehabilitation Services</u>

Before applying for the social security benefits at issue in this case, the plaintiff attempted to go back to work with the assistance of DORS. (Tr. 58). On March 15, 2021, the plaintiff was referred to the DORS' trial work experience program and was assigned Marie Geelan as his counselor. (Tr. 349). On May 25, 2021, DORS issued a letter to the plaintiff indicating his case had been closed for the following reason: "too severe to benefit from vocational rehabilitation." (Tr. 838 (citation modified)). Attached to the letter was Lopez's mental capacity questionnaire from November 5, 2021, indicating the plaintiff suffered from depression and would not be able to perform unskilled, sedentary work for eight hours per day, 40 hours per week, for 50 weeks per year. (Tr. 839).

---

[9] These physical therapy sessions are not included in the record.

After the hearing before the ALJ, on April 3, 2023, the plaintiff's counsel supplemented the record with what he described as the "details of the DORS determination."[10] (Tr. 348). The supplement included a form Geelan had completed about the plaintiff's areas of performance at the Burlington Coat Factory. The plaintiff met standards for all aspects unrelated to his physical ability: attendance and punctuality, general appearance, ability to follow instructions, ability to interact with co-workers, attentiveness and concentration, ability to accept constructive criticism, ability to handle a variety of tasks, quality of work, initiative, knowledge of and adherence to work rules, ability to work without supervision, and ability to ask appropriate questions or seek assistance. (Tr. 350). However, he could not meet the standards required for physical stamina, ability to deal with change, and completion of work in the required pace. Geelan noted that his "pace was affected by his injury" and, because of his injury, he "was not able to deal with changes in physical position." (*Id.*). She also observed that the plaintiff "was unable to work more than 30 minutes standing or 15 minutes sitting in the folding chair provided without requiring a break or feeling intense pain because of his serious back injury." (*Id.*).

### E.    **Medical Experts**

The record includes medical opinions from various experts. Beginning with the experts who did not treat the plaintiff, the record includes reports from four state agency consultants who evaluated the plaintiff's medical records but did not meet the plaintiff.[11] At the initial stage of the plaintiff's social security benefits application, Dr. Robert Decarli, PsyD, evaluated the plaintiff's

---

[10] During the hearing on March 25, 2023, the ALJ informed the plaintiff's counsel that he wanted additional information about why the plaintiff's condition was "too severe to benefit from vocational rehabilitation." (Tr. 73).

[11] The record includes Disability Determination Examinations at the initial and reconsideration stages, and there are two separate reports for both DIB and SSI at each stage. Because the DIB and SSI reports are identical at each stage, the Court will cite to the DIB reports.

mental impairments, and Dr. Samuel Bridgers, MD, evaluated his physical impairments. (Tr. 123–40). At the reconsideration stage, Dr. Adrian Brown, PhD, evaluated the plaintiff's mental impairments, and Dr. Richard Papantonio, MD, evaluated his physical impairments. (Tr. 141–52). The record also contains medical opinions from two consultative examiners who met with the plaintiff on a single occasion. On February 2, 2022, Anthony F. Campagna, PhD, evaluated the plaintiff's mental health status and wrote a psychological evaluation report. (Tr. 921–29). That same month, Diana Torok, MD, evaluated the plaintiff's chronic back pain, degenerative disc disease, and epilepsy and issued a report. (Tr. 930–37).

Two providers from Community Health Center also submitted medical opinions. On November 5, 2021, the plaintiff's psychotherapist, Ivan Lopez, LCSW, completed a mental capacity questionnaire regarding the plaintiff's participation in the State of Connecticut's rehabilitation services, and, on December 15, 2021, he completed a general mental health evaluation. (Tr. 839, 907–14). On September 29, 2022, Lopez and Sarah Freiberg, APRN, who managed the plaintiff's psychiatric medication treatment, wrote a letter describing the plaintiff's depression, PTSD, and other mental health struggles. (Tr. 1012–13).

### 1.    Initial Stage

At the initial stage of the plaintiff's DIB/SSI application, Dr. Decarli evaluated the plaintiff's mental limitations, and Dr. Bridgers evaluated his physical limitations. The record included one submission from the plaintiff's optometrist Dr. Rafael Armando, two submissions from Community Health Center of Meriden, one submission from Yale New Haven Health, and one non-medical report from the plaintiff. The records summary reflected four appointments from November 2018 through July 2021 for the plaintiff's history with seizures; eight appointments from December 2018 through July 2021 for his back pain; two appointments in July 2020 and June

2021 for his vision issues; and five appointments from July 2020 through June 2021 for his anxiety and depression. (Tr. 124–25).

With respect to the plaintiff's physical residual functional capacity ("RFC"), Dr. Bridgers concluded that the plaintiff could lift or carry twenty pounds occasionally and ten pounds frequently and was otherwise unlimited in his ability to push and pull; could stand or walk with normal breaks for four hours in an eight-hour workday; sit for about six hours in an eight-hour workday; could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl occasionally but never climb ladders, ropes, or scaffolds because of his epilepsy; had limited vision in his right eye; should avoid concentrated exposure to extreme heat and humidity; and should avoid all exposure to hazards due to his epilepsy. (Tr. 127–29). Dr. Bridgers concluded the plaintiff's exertional limitations resulted from his back pain, which was compounded by obesity. (Tr. 127).

When prompted to provide an additional explanation about the plaintiff's RFC, Dr. Bridgers described a 60-year old male with cervical disc degeneration, carpal tunnel, and lumbar disc displacement with radiculopathy who had an onset date of January 22, 2021 and was forced to retire from his career as a dentist due to his injuries. (Tr. 129). This description does not match the plaintiff's age, combination of symptoms, or onset date.

For the plaintiff's mental RFC, Dr. Decarli determined the plaintiff did not have limitations with understanding and memory or adaptation, but he did have limitations with sustained concentration and persistence as well as social interaction. (Tr. 129–30). Specifically within these frameworks, Dr. Decarli concluded the plaintiff was moderately limited in his ability to (a) "maintain attention and concentration for extended periods," (b) "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," and (c) "interact

appropriately with the general public," but he was not significantly limited in all other metrics. (Tr. 129). When prompted to opine on the plaintiff's sustained concentration and persistence, Dr. Decarli stated he "can do simple work for 2hr periods in an 8hr day with adequate attention, concentration, and pace" but he "could have occasional problems [<1/3 of the time] with prolonged concentration and pace." (Tr. 130 (citation modified)). With respect to social interactions, Dr. Decarli stated the plaintiff "can engage in typical interaction with coworkers and supervi[s]ors while completing rrt that does not require teamwork or collaborative efforts" and that "he would do best in a job away from the public." (*Id.* (citation modified)).

## 2.    Reconsideration Stage

At the reconsideration stage, Dr. Brown evaluated the plaintiff's mental limitations and Dr. Papantonio evaluated the plaintiff's physical limitations. In addition to the evidence submitted at the initial stage, the record on reconsideration included reports from two consultative examiners, Drs. Campagna and Torok; three additional submissions from Yale New Haven Health and one submission each from the Yale Epilepsy Center and the Spine Center; two additional submissions from the Community Health Center of Meriden; and other submissions that were unspecified, from the plaintiff, or from his representative, Regina Carlton. (Tr. 142). The records summary on reconsideration reflected one appointment in May 2021 for the plaintiff's history with seizures and the consultative examiners' reports on same; ten appointments from December 2018 through February 2022 for his back pain, the DORS letter, and the consultative examiners' reports on his back pain; one consultative examiner's report on his vision issues; ten appointments from August 2021 through December 2021 for his anxiety and depression and one consultative examiner's report on same; and one record from November 2021 for the plaintiff's allergies and one consultative examiner's report on same. (Tr. 143–45).

Dr. Papantonio determined the plaintiff's physical RFC. Most of Dr. Papantonio's determination mirror that of Dr. Bridgers at the initial stage. Also like Dr. Bridgers, Dr. Papantonio's additional explanation referenced a 60-year old retired dentist. (Tr. 149). The only differences were that, unlike Dr. Bridgers, Dr. Papantonio determined the plaintiff did not have visual limitations, (Tr. 148), and he summarized an examination from February 16, 2022 (Tr. 149).

Dr. Brown's mental RFC on reconsideration differed from Dr. Decarli's assessment at the initial stage. Dr. Brown similarly found that the plaintiff had limitations with sustained concentration and persistence, concluding the plaintiff was moderately limited in his ability to (a) "maintain attention and concentration for extended periods" and (b) "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 150). Unlike Dr. Decarli, Dr. Brown found the plaintiff *did not* have social interaction limitations but he *did* have limitations with understanding and memory as well as adaptation. Within these frameworks, Dr. Brown concluded the plaintiff was moderately limited in his ability to (a) "understand and remember detailed instructions" and (b) "respond appropriately to changes in the work setting," but he was not significantly limited in all other metrics. (Tr. 150–51). Dr. Brown added that the plaintiff had reduced stress tolerance and "would not respond well to abrupt, frequent, major changes in routine," finding also that the plaintiff "can adapt to minor changes in work routine." (Tr. 151).

### 3.    Other Opinions

Lastly, the record contains two reports from consultative examiners: Dr. Campagna, who evaluated the plaintiff's mental health (Tr. 921–29); and Dr. Torok, who evaluated the plaintiff's back pain and epilepsy (Tr. 930–37).

On February 2, 2022, Dr. Campagna conducted a psychological evaluation of the plaintiff. (Tr. 921).  Prior to the examination, Dr. Campagna attempted to review the referral letter but was "unable to open to the documents."  (*Id.*).  Dr. Campagna administered a clinical interview, the Weschler Adult Intelligence Scale – Form IV , and the Folstein's Mini-Mental State Examination. (Tr. 921).  Upon completing these evaluations, Dr. Campagna concluded the plaintiff met the criteria for a neurocognitive disorder (Listing 12.02) due to "memory impairment, diminished cognitive processing efficiency, and diminished capacity for language-based and non-verbal concept formation."  (Tr. 924).  Dr. Campagna explained further:

> No impairment in his ability to interact with others is present.  He can concentrate and persists on tasks.  Work pace is moderately diminished.  Deficits moderately reduce his ability to adapt to changes in his life circumstances and moderately limit his ability to independently manage all age-appropriate adaptive functions.  Based on the evaluation results, he can manage benefit payments in his own interest as long as he writes down calculations to reinforce his memory.  The history and evaluation results support poor prognosis for significant improvement.

(*Id.*).  With respect to his ability to work, Dr. Campagna concluded that the plaintiff "can understand, retain, and carry out simple instructions, and can make simple work-related decisions;" that he has "moderate difficulty retaining complex instructions" but can perform them when he understands them and can make complex work-related decisions; "[h]e can respond appropriately to supervisors, coworkers, and the public;" and his dysphoria and processing/memory difficulties reduce his ability to manage stress and changes in the workplace.  (Tr. 924–25).

On February 16, 2022, Dr. Torok conducted a physical examination of the plaintiff.  (Tr. 930).  Dr. Torok noted the plaintiff's medication, his self-reported symptoms, and his medical history.  (Tr. 931–32).  In relevant part, Dr. Torok described the plaintiff's ability to maneuver: "The claimant cannot squat.  The claimant cannot perform tandem heel walking.  The claimant is not able to bend over and touch his toes.  The claimant can get [in] and out of a chair with mild

difficulty.  The claimant is able to get on and off the exam table with mild difficulty." (Tr. 932).

Dr. Torok also noted the plaintiff could ambulate slowly "without difficulty and without any

assistive advice" and that his gait was normal.  (*Id.*).  He also observed the plaintiff had decreased

knee, leg, hip, and back flexion due to back pain.  (Tr. 933–34).  With respect to the workplace,

Dr. Torok concluded the plaintiff could walk or stand for four hours in an eight-hour workday, sit

for six hours in an eight-hour work day; lift or carry ten pounds frequently and twenty pounds

occasionally; and occasionally kneel, bend, crawl, and perform other postural activities.  (Tr. 935).

Dr. Torok did not identify any other limitations.  (*See id.*).

## III.    **THE ALJ'S DECISION**

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner

to determine whether a claimant is disabled within the meaning of the Act.  *See* 20 C.F.R. §

404.1520(a).[12]    In this case, the ALJ determined that the plaintiff met the insured status

requirements under the Act through March 31, 2023.  (Tr. 30).  At step one, the ALJ found that

---

[12] An ALJ determines a claimant's disability using a five-step analysis.  *See* 20 C.F.R. § 404.1520.  First, an ALJ must determine whether a claimant is currently working.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If a claimant is currently employed, then the claim is denied.  *Id.*  If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment.  If none exists, then the claim is also denied.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998).  If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80.  If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that he cannot perform his former work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If a claimant shows that he cannot perform his former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows that he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

the plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 8, 2019, a period exceeding the twelve-month statutory requirement.  (Tr. 31).

At step two, the ALJ determined that the plaintiff had the following severe impairments: obesity, epilepsy/seizure disorder, degenerative disc disease of the lumbar spine, depressive disorder, and PTSD.  (Tr. 31).

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 31).  In doing so, the ALJ considered his physical impairments against Listings 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina) and 11.02 (epilepsy) and his mental impairments against Listings 12.04 (depressive, bipolar and related disorders ) and 12.06 (anxiety and obsessive-compulsive disorders).  *See* 20 C.F.R. part 404, Subpart P, Appendix 1.

Next, the ALJ formulated the plaintiff's RFC.  A plaintiff's RFC is the most they can do despite their impairments and is determined by assessing all the relevant evidence.  20 C.F.R. §§ 404.1545(a)(1).  The ALJ determined the plaintiff had the RFC to perform light work with the following additional restrictions:

> the claimant can lift[ ] or carry[ ] or push[ ] or pull[ ] 20 pounds occasionally and 10 pounds frequently; stand or walk with normal breaks for four hours in an eight-hour workday; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; never climb ladders, ropes, or scaffolds; never have concentrated exposure to extreme heat or humidity as these types of environmental limitations are defined in the selected characteristics of the dictionary of occupational titles; and never have exposure to hazards such as proximity to moving mechanical parts, exposure to electrical shock, working in high exposed places, exposure to radiation, or working with explosives as these types of environmental limitations are defined in the selected characteristics of the dictionary of occupational titles.  The claimant can perform routine and repetitive work involving simple but not complex instructions for two hour periods across a normal workday and workweek where there is no more than occasional changes in a routine work setting.

(Tr. 33).

The ALJ summarized the plaintiff's testimony and found that his statements "concerning the intensity, persistence and limiting effects" of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 34).

The ALJ then summarized the objective medical evidence and the medical expert opinions. With respect to the medical opinions, the ALJ determined (a) the three letters from plaintiff's therapist, Ivan Lopez, ranged from not persuasive to somewhat persuasive; (b) the reports from consultative examiners, Drs. Torok and Campagna, were somewhat persuasive; (c) the reports from the state agency consultants at the reconsideration stage, Drs. Brown and Papantonio, were persuasive as to the plaintiff's physical and mental limitations; and (d) the report from the state agency consultant at the initial stage regarding mental health, Dr. Decarli, was less persuasive. (Tr. 38–40). The ALJ did not assess Dr. Bridgers, who evaluated the plaintiff's physical limitations at the initial stage. (*Id.*).

At step four, based on the testimony of the vocational expert, the ALJ found that the plaintiff could perform his past relevant work as a document preparer. (Tr. 40). The ALJ also concluded the plaintiff could perform other jobs in the national economy, such as photocopying machine operator, office helper, and non-government mail clerk. (Tr. 42). Given this finding, the ALJ found that plaintiff was not disabled. (*Id.*).

## IV.    **STANDARD OF REVIEW**

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their

conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. § 405(g).  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  Substantial evidence means more than a scintilla, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 229 (1938)).  Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence.  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  "Such a deferential standard, however, is not applied to the Commissioner's conclusions of law."  *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y. 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled."  *Id*.  "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have his disability determination made according to the correct legal principles."  *Johnson*, 817 F.2d at 986.

## V.  **DISCUSSION**

The plaintiff's raises two main arguments in this appeal.  First, he argues that the ALJ failed to fully develop the administrative record because he did not obtain an opinion from a medical provider regarding the plaintiff's back pain or any physical therapy records from June and July 2021, and as a result, the substantial evidence does not support the RFC.  (Doc. No. 24-1 at

7–10).  Second, he argues that the ALJ erred by failing to discuss Marie Geelan's evaluation of the plaintiff's limitations exhibited during his vocational rehabilitation training with DORS.  (*Id.* at 10–13).

The Commissioner challenges both arguments.  As to the first issue, the Commissioner contends the ALJ adequately developed the record, did not have an obligation to obtain another medical opinion from a provider, and properly relied on the medical opinions and objective medical evidence in the record.  (Doc. No. 26 at 5–13).  With respect to the second issue, the Commissioner maintains that the ALJ did not ignore Counselor Geelan's evaluation, because he "generally observed Counselor Geelan was not 'an acceptable medical source.'"  (*Id.* at 13–14).  The Commissioner also notes that Social Security Ruling 06-3p, which the plaintiff cites, was rescinded on March 27, 2017.[13]  (*Id.* at 14).

For the following reasons, the Court finds that the ALJ committed reversible error and that this case should be **REMANDED** for additional proceedings.

A.    <u>Sufficiency of the Record</u>

The plaintiff first argues the case should be remanded because the ALJ failed to adequately develop the record.  Specifically, the plaintiff argues that the ALJ failed to seek an opinion from one of the plaintiff's providers and, as a result, the ALJ improperly relied on the consultative opinions and treatment records.  (Doc. No. 24-1 at 7).  In addition, the plaintiff points out that physical therapy records from June and July 2021 were not submitted into evidence.  (*Id.* at 8).  The plaintiff acknowledges that a treating physician's opinion is not necessarily required as long as there is sufficient evidence to support the RFC, but he contends that this record is insufficient without the medical opinion and physical therapy evidence.  (*Id.*).  Going further, he maintains

---

[13] While it is true that Social Security Ruling 06-3p was rescinded effective March 27, 2017, that ruling is not relevant to the Court's decision.

that "[t]he ALJ had no evidence to support his conclusion that [the plaintiff] could sit without any limitation and was not qualified to make this deduction from the medical records alone." (*Id.* at 10).

The defendant disagrees. First, the defendant argues that a "well-supported opinion" from a consultative examiner and a state agency consultant can constitute substantial evidence for the purposes of determining an RFC. (Doc. No. 26 at 5). Second, the defendant takes issue with the plaintiff's characterization of the regulations, contending he improperly advocates for the ALJ to defer to a treating physician's medical opinion. (*Id.* at 6). According to the defendant, the Commissioner is only required to develop the record "at the *application* stage" (*id.* at 8) and the regulations instead "put the onus on Plaintiff to develop the record" more generally (*id.* at 7).[14] The defendant then summarizes the ALJ's findings as to each medical opinion and argues the ALJ properly evaluated them. (*Id.* at 9–13).

## 1.      The ALJ Failed to Develop the Record

Because the parties seem to disagree about the scope of the ALJ's duty to gather evidence, the Court begins with a summary of the parties' respective burdens. The plaintiff is required to inform the Commissioner of and submit all known evidence, and he must disclose additional evidence upon becoming aware of it. 20 C.F.R. § 404.1512(a)(1). It is the Commissioner's duty, however, to "develop [the plaintiff's] complete medical history." 20 C.F.R. § 404.1512(b)(1). The ALJ's "affirmative obligation to develop the administrative record" exists "[b]ecause a hearing on disability benefits is a non-adversarial proceeding." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted). This duty exists even when, as in this case, the claimant is represented by counsel. *Id.* (citation omitted); *see also Burgess v. Astrue*, 537 F. 3d 117, 128 (2d Cir. 2008).

---

[14] The defendant further posits that the existence of two medical opinions by providers in the record—and the ALJ's evaluation of those opinions—shows that the record was adequately developed. (*Id.* at 8).

"Whether the ALJ has satisfied this duty to develop the record is a threshold question" that must be answered before evaluating the substantial evidence.  *Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 577 (S.D.N.Y. 2022).  To satisfy this duty, the ALJ must develop the record "when additional information is needed due to the vagueness, incompleteness, or inconsistency of the treating source's opinion."  *Moreau v. Berryhill*, No. 3:17 CV 396 (JCH), 2018 WL 1316197, at *11 n.6 (D. Conn. Mar. 14, 2018) (citations omitted); *see* 20 C.F.R. § 404.1520b(b)(2)(i).  This includes "seeking additional evidence or clarifications from medical sources" when the record is insufficient.  *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-0502 (AJN) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom. Cuevas v. Comm'r of Soc. Sec.*, No. 20CV0502KMWKHP, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022).  However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal quotation marks omitted).

Here, the record is missing physical therapy records from June and July 2021.  (*See* Doc. No. 24-1 at 8; Tr. 942).  While these records only span two months, they are significant in the context of the longitudinal record.  Since his injury in 2017, the plaintiff has attempted to improve his back pain through physical therapy without any meaningful results.  The records show that the plaintiff underwent physical therapy in 2017 and again in late 2018 through early 2019 without any improvement.  (Tr. 504–571).  He tried for a third time to improve his pain during the height of the COVID-19 pandemic, by "completing a home exercise program on a daily basis from June of 2020 to September of 2020," but, as with his earlier efforts, the plaintiff experienced "limited relief in symptoms."  (Tr. 540).  In June and July 2021, he completed another round of physical

therapy, again with no success.  At the plaintiff's next Spine Center appointment in February 2022, his provider wrote, "Given that the patient has completed a 2 month course of physical therapy focused on lumbar stretching and strengthening in June and July of 2021 without significant relief, I have ordered MRI of the lumbar spine to assess for intraspinal pathology in greater detail."  (Tr. 943 (emphases removed)).  In other words, the plaintiff's provider deemed these records—which documented the plaintiff's failure to improve—notable enough to warrant additional testing and evaluation.  The timing of the missing records is significant, because the physical therapy predates the consultative examiners' and the state agency consultants' work on the case; the records could have impacted these examinations and reports insofar as they evidence the plaintiff's consistent efforts to improve his back pain with no success.

In addition, the record does not include a medical opinion from a provider who treated the plaintiff's back pain.  When formulating an RFC, an ALJ fails to develop the record if the ALJ does not 'request a functional assessment when no such assessment exists in the record or when any such assessments are insufficient.'"  *Maribeth N. v. King*, No. 3:24-cv-212 (VAB), 2025 WL 437299, at *9 (D. Conn. Feb. 7, 2025) (quoting *Jackson*, 588 F. Supp. 3d at 583); *c.f. Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 164 (S.D.N.Y. 2022) (remanding where "[t]he ALJ . . . had no opinion from any medical source, treating or otherwise, as to the significance of the additional records or their implication for Ms. Russ's functional abilities" and noting that "records suggest chronic pain in multiple parts of the body of a varying but generally high degree").

Despite the absence of a medical opinion by a provider, the defendant contends that the ALJ satisfied his duty by retaining a consultative examiner.  (Doc. No. 26 at 8).  The Court disagrees.

As an initial matter, Dr. Torok's functional assessment lacks clarity in light of the examination results.[15] During the physical examination, Dr. Torok noted the plaintiff had "[r]ight paraspinal muscle tenderness" and further documented the following:

> The claimant is not able to walk on toes or walk on heels. The claimant cannot squat. The claimant cannot perform tandem heel walking. The claimant is not able to bend over and touch his toes. The claimant can get up and out of a chair with mild difficulty. The claimant is able to get on and off the exam table with mild difficulty.

> The patient ambulates without difficult and without any assistive device, however, walks slow.

(Tr. 932–33). She also described the plaintiff's pain as follows: "The claimant states he can walk for 15 minutes before his back pain gets very severe. The claimant can stand for approximately 15 minutes. He can sit for about 20-30 minutes. He states that he has difficulty with lifting more than 10 lbs. The claimant states he can climb 1 flight of stairs but with difficulty." (Tr. 931).

Notwithstanding these results, Dr. Torok found that the plaintiff could walk or stand for four hours in a workday; sit for six hours in a workday; lift or carry ten points frequently and twenty pounds occasionally; and occasionally kneel, bend, or crawl. (Tr. 935). It is unclear how Dr. Torok determined that the plaintiff could walk or stand for four hours or sit for six hours in a workday, given the plaintiff's statements that he could not walk for fifteen minutes, stand for more than fifteen minutes, or sit for more than thirty minutes without severe back pain. Said another way, without additional evidence or further explanation from Dr. Torok, her functional assessment and the examination results are meaningfully inconsistent. The Court concludes Dr. Torok's opinion is too vague, unclear, and inconsistent to satisfy the ALJ's duty to develop the record. *See Moreau*, 2018 WL 1316197, at *11–12.

---

[15] The Court notes the ALJ found Dr. Torok's "assessment is supported by the exam findings." (Tr. 39). Whether the ALJ erred in evaluating the medical opinions is not at issue on appeal.

In addition, the ALJ pointed out that Dr. Torok did not have the benefit of reviewing the medical record. (Tr. 39). This means that Dr. Torok's assessment was based on a single examination of the plaintiff. While the defendant is correct that a consultative examiner's report can satisfy the duty to develop the record (Doc. No. 26 at 5), this is not a *per se* rule. Indeed, the regulations contemplate that the Commissioner will "give the examiner any necessary background information about your condition." 20 C.F.R. § 404.1517. The fact that this aspect of the regulation was apparently not satisfied weighs against a finding that Dr. Torok's examination satisfies the ALJ's duty to develop the record.

Setting aside the shortcomings of the consultative examiner's opinion, the state agency consultants fare no better. When prompted to provide an additional explanation about the RFC, both Drs. Bridgers and Papantonio discussed the wrong individual, a retired dentist in his 60s. (Tr. 138, 149). Because their explanations are based on the wrong person, the ALJ should have revisited their reports to confirm the accuracy of the other aspects of their RFC assessment. He did not.

Under these particular circumstances, the Court finds that the ALJ failed to satisfy his duty to fully develop the record. "It is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Balsamo*, 142 F.3d at 81 (internal quotation marks omitted); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("ALJ is not permitted to substitute his own expertise or view of the medical proof . . . for any competent medical opinion") (internal citations omitted); *see Manzella v. Comm'r of Soc. Sec.*, No. 20-CV-3765 (SLC), 2021 WL 5910648, at *14 (S.D.N.Y. Oct. 27, 2021), *report and recommendation adopted*, No. 20-CV-3765 (VEC), 2021 WL 5493186 (S.D.N.Y. Nov. 22, 2021) ("ALJs may not, of course, 'play doctor' by using their own lay opinions to fill evidentiary gaps in the record"); *Delgado v.*

*Berryhill*, No. 3:17-CV-54 (JCH), 2018 WL 1316198, at *7 (D. Conn. Mar. 14, 2018) (remanding due to ALJ's failure to develop the record where the opinions in the record did not sufficiently address the claimant's limitations).   At the very least, the ALJ should have sought additional information and/or clarification from Dr. Torok and the state agency consultants who evaluated the plaintiff's physical limitations.[16]   Given the shortcomings of these opinions, the ALJ did not have a single medical opinion on which he could rely.   *See Baltes v. Berryhill*, 1:17-CV-00211(JJM), 2018 WL 5993365, at *3 (W.D.N.Y. Nov. 15, 2018) ("[E]ven though the Commissioner is empowered to make the RFC determination, where the medical findings in the record merely diagnose the claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities, the general rule is that the Commissioner may not make the connection himself.").

### 2.    The Record Lacked Sufficient Evidence of the ALJ's RFC

"While not binding precedent, the Second Circuit has found that 'remand is not always required when an ALJ fails in his duty to request opinions, particularly where, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.'" *Maribeth N.*, 2025 WL 437299, at *9 (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)) (citation modified).

In addition to the shortcomings referenced above, the record here does not contain sufficient evidence to determine the plaintiff's RFC.   This is particularly true because the plaintiff attempted to go back to work through DORS' vocational rehabilitation program in May 2021.   (Tr. 349).   His supervisor sent him home after a short period of time and stated that the plaintiff "was unable to work more than 30 minutes standing or 15 minutes sitting in the folding chair provided

---

[16] The plaintiff does not raise any issues with the evaluations of his mental health.   On remand, the parties may opt to revisit the entire record.

without requiring a break or feeling intense pain because of his serious back injury." (Tr. 350). The ALJ's RFC does not consider or account for this evidence of the plaintiff's need for breaks or his intense pain.

Indeed, the records about the plaintiff's back pain show his condition had not improved since his initial evaluation in December 2018. (Tr. 504). For example, at his initial appointment, his provider noted the plaintiff had a "chronic history of back pain with radiation to the right hip and bilateral groin with numbness and tingling to the bilateral anterior thighs," noting also that his "pain is increased with prolonged walking and sitting." (*Id.*). The examination showed mixed results, for instance: increased pain with palpitation, flexion, and extension, but a non-antalgic gait, no need for an assistive device, and normal alignment and muscle tone in his extremities. (Tr. 506). The plaintiff's subsequent Spine Center appointments consistently showed no improvement in his condition. (*See* Tr. 522, 541, 544, 942–43, 978 (1/17/19, 9/22/20, 10/21/20, 2/22/22, 4/13/22)). The last Spine Center appointment notes the following MRI impression and plan:

> 45-year-old male with several year history of axial low back pain and bilateral posterior thigh pain in the setting of lumbar MRI from April 2022 demonstrating multilevel degenerative changes DDD without severe central stenosis.
> - I referred the patient to Physical Medicine Rehabilitation for evaluation of possible lumbar facet injections and other nonsurgical treatments given multilevel degenerative disc disease and spondylosis and predominance of axial low back pain.
> - I referred the patient to the orthopedic surgery service regarding his bilateral knee pain.

(Tr. 979). In light of the persistent and consistent documentation of the plaintiff's worsening back pain and the lack of any medical opinion regarding the plaintiff's physical limitations that accounts for the medical evidence in the record, the Court finds that this case must be remanded for further development of the record.

B.    **The DORS Evidence**

In the alternative, the plaintiff argues that the ALJ committed legal error when he mistakenly failed to consider Counselor Geelan's evaluation, which the plaintiff submitted after the hearing. (Doc. No. 24-1 at 11). The plaintiff contends that Counselor Geelan's observations were significant because they corroborated the plaintiff's descriptions of his limitations, and they contradicted the consultative examiners' conclusions. (*Id.*) Where the ALJ noted he would not have credited Counselor Geelan's position even if it had been provided, the plaintiff points out that an RFC must be based on all evidence, including non-medical evidence, and that the ALJ was required to explain why he did not consider an opinion. (*Id.* at 11–12).

The defendant appears to concede the ALJ did not evaluate the plaintiff's supplemental submission. (Doc. No. 26 at 13–14). Still, the defendant argues that the ALJ adequately evaluated the DORS letter by explaining that it was not persuasive and generally concluded Counselor Geelan was not an acceptable source. (*Id.* at 14).

There is a substantive difference between the letter initially submitted in the record, which the ALJ did review, and the supplemental submission, which he did not review. The letter dated March 25, 2021, merely states that the plaintiff's condition is "too severe to benefit from vocational rehabilitation." (Tr. 838 (citation modified)). When the ALJ requested additional information during the hearing, he explained that he planned to discuss the DORS evidence in his decision but that he had "no idea what was too severe for [the plaintiff] to benefit from any vocational rehabilitation." (Tr. 73–74). The ALJ also specified that he would have a supplemental hearing to "speak with the person who worked with [the plaintiff] on that date." (Tr. 74). Shortly after, the plaintiff submitted additional information, including a detailed evaluation filled out by Geelan

with specific comments as to why the plaintiff could not perform his job due to his back pain.  (Tr. 350).

But the ALJ's decision strongly suggests that he did not review the supplemental submission.  He states: "The claimant was given two weeks to prove a report from the evaluation if he had one.  Nearly two months have passed and [an] actual DORS evaluation report has never been provided."  (Tr. 38).  While it is true that the DORS evaluation is not medical evidence, the RFC "must be based on *all* of the relevant evidence in the case record, such as . . . evidence from attempts to work [and] work evaluations, if applicable."  SSR 96-8P, 1996 WL 374184, at *5 (S.S.A. July 2, 1996) (emphasis in original).  The ALJ should have considered this critical piece of evidence about the plaintiff's functional abilities and limitations in a workplace setting.

The Court notes two issues regarding the ALJ's finding that "the report is not persuasive." (Tr. 38).  First, non-medical evidence falls into an entirely different category from medical opinions, and the ALJ should not be evaluating the persuasiveness under the § 404.1520c.  Second, while the ALJ found the evaluation was not persuasive because it "does not discuss the claimant's work capacity," the Court notes that the supplemental submission does in fact address his work capacity.  On remand, the ALJ should reevaluate the DORS evidence (including by holding an additional hearing if necessary) under the correct legal standards.

### C.    **Additional Issues on Remand**

As explained above, this case is remanded so the ALJ can obtain a medical opinion from a provider who treated the plaintiff for his back pain, gather physical therapy records from June and July 2021, and evaluate the supplemental submission from DORS.  If the parties determine it would be beneficial for the DORS supervisor to testify, they can also consider holding a supplemental hearing.  The Court notes that the plaintiff complained to his therapist that his lawyer

"did not have the records that he was supposed to have" at his agency hearing. (Tr. 1019). On remand, the defendant should work with the plaintiff to ensure that all of the records have been collected and submitted.

In addition, the state agency reports need to be corrected, because they currently reference the wrong individual. The Court expresses no opinion as to whether Drs. Bridgers and Papantonio should resubmit an evaluation or new examiners should be retained. Lastly, the ALJ failed to assess the persuasiveness of Dr. Bridgers, the state agency consultant who addressed the plaintiff's physical limitations at the initial level. (Tr. 39).

## VI.    **CONCLUSION**

The plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 18) is **GRANTED** and the Commissioner's motion to affirm that decision (Doc. No. 24) is **DENIED**. The Clerk shall enter judgment and remand this matter to the Commissioner for further administrative proceedings consistent with this decision. The Clerk is respectfully requested to close this case.

This is not a Recommended Ruling. The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals from this judgment can be made directly to the appropriate United States Court of Appeals. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

It is so ordered this 29th day of August 2025, at New Haven, Connecticut.

                          ___/s Robert M. Spector_____
                          Robert M. Spector
                          United States Magistrate Judge

31